Good morning, Lawrence Rolfing on behalf of Flurry Wellington. This is a criminal justice security case involving an unsubstantiated issue. It's the same impairment that was brought back in time. It's not a different impairment. The investigative law judge accepted the report of Dr. Cushman. Dr. Cushman describes the woman as insensitive and requires a history of sexual abuse as a child. She was repeatedly molested by her uncle, who died when she was 12, and it stopped. She was abused by her stepfather. She was abused verbally, at least verbally, by her husband, who she was married to for 10 years. And Dr. Cushman has a complete mental status examination with positive findings and says that she has, as a result of her medical history, sexual abuse as a child, physical and sexual abuse as an adult, plus traumatic stress disorder. She was robbed at gunpoint while working in a store. She has a panic disorder associated with psychological factors, and she has a dependent personality disorder. She has a drug history that's in complete remission by this point. And Dr. Cushman describes significant impairments in the ability to perform work activities, like tolerating the ordinary stress of workday and showing up on time. Things that the judge agrees, these destroy the ability to engage in substantial meaningful activity. The commissioner argues, well, Ms. Wellington actually got worse after Dr. Cushman ceased Ms. Wellington's stay in May of 2011 because she got re-contacted by her ex-husband, and she then got forever dizzy. And then her father dies, and that aggravates her mental condition. The important thing to remember is that the judge did not assign an onset date based on any post-extreme trauma. He found that the woman that Dr. Cushman examined was, in fact, disabled. She didn't become disabled when she walked through the door. She was disabled before she got in the door. And at the end of the insert period in 2008 and into 2009, we have numerous emergency room visits that describe her, either primarily secondary or tertiary, as having anxiety disorders discernible and obvious to a trained mental health professional, but to an emergency room physician. And the question is, does Dr. Cushman's sink in the sand and cast a shadow back in time that a medical expert or some other person could establish an onset date? The commissioner argues that it was clear that Dr. Cushman described the woman as disabled on that day. I agree. It was also clear that she was disabled before she walked in the door. This is the case where the impairment that is, frankly, disabled has a long and chronic history and casts a shadow back in time. And it's exactly the kind of case that 8320, Armstrong, and other cases from this court have described as requiring the input from a medical expert to tell us when, whether it's January of 2011, so she gets another four months of SSI, or December 31, 2008, when she's in this hospitalization sequence where she's going repeatedly to the emergency room. So she gets some disability insurance benefits. She gets Medicare instead of Medi-Cal. Maybe you can help me with this. Because I'm totally familiar with it. So let's say that we agree with your position that a medical expert were to be appointed. How exactly do you train a medical professional to go about it? I mean, you have the person in front of you. You have the records. And you've got them. I've seen a lot of emergency room visits and hospitalizations like that. You see those? Look at those. That's the day. I mean, that's what I'm just curious about. What can a medical expert do to help with this problem? Well, there are several factors. One is the mental status examination that we have from Dr. Trishman. And we have the history of trauma as a child and as an adult. And we have the history of emergency room treatment, where there's clearly psychological factors that are pushing this woman into the emergency room with pain complaints because she's, well, I don't want to pretend to be a doctor either, but she's having physical manifestations of her psychic problems. And it comes from a medical expert who looks at that and says, the person that Dr. Trishman is describing, that condition had a pre-diagnostic pre-morbid phase that extends back. Well, don't get me wrong. You're absolutely right. I don't think that it was the examination. I thought it was in May of 2010. That's what I understood. I'm sorry. I misspoke. That could not have suddenly rendered her disabled. I mean, clearly this had been going for a while. But I look at these records and thankfully I'm not called upon to make this determination. But I wouldn't be able to say, you know, well, it's not even January of 2010. It's not January of 2010. It's this date right here. I mean, you know what? Some of the physical complaints that you're finding out are like the palpitations. Instead of figuring out the test, they're like, man, you're fine. These are all normal. We can see that you're suffering in some kind of outward way, but we've run our tests and we can't find anything wrong with you. Right. Well, one of the factors that plays into this is we have the presidential case of sophistication to go after mental health treatment. When we as professionals look at a case, as long as a case has been in mental health treatment for years, why aren't you in treatment? We don't penalize her for making that poor decision. That's just a double hit on top of the trauma of her life. But treating mental health, the analogy is that we can look at a case, and because of our experience as lawyers and as judges, we know we can start to discern before we turn the page what happened and why and what the next factors are going to be. And we're right 90% of the time because of our experience as the CTO of a mental health professional. This is why when Congress passed the Disability Reform Act of 1984, they required that mental health professionals be involved in the initial re-consideration stages of disability determinations, because we as lay people lack the professional insight to see Dr. Krishnan's report and the history and these other medical records in the background, and to either interpolate or extrapolate, whichever geometric progression is necessary, the correct, medically reasonable, honestly, not to a medical certainty, but to a medical probability. And I would urge that so that when we have that medical professional, this is why we didn't ask for the word personal for the payment of benefits, this requires a medical professional, the agency is described as required under these circumstances. Okay. Why don't we hear from that guest and give you a chance to respond. Thank you. Thank you. Good morning, Your Honors. Elizabeth Spear for the Acting Commissioner of Social Security. This is a 8320. It does not require some kind of magical assumption of when a disability started.  It's a legal conclusion, not an emotional one. And what that SSR requires is that the onset date have a legitimate medical basis. What we have here, well, Mr. Ralfie is talking about all these things that happened to his client early on, but she worked until one week before she was elected. She was far less concerned. Absolutely. But you go through, I mean, it's like when she was fired, I guess the day before Christmas in 2008, right? So it sounds like she was fired. There's nothing in her record that says she was fired. It says she stopped working. Well, I thought that she hadn't been showing up for work. Well, she didn't. It doesn't mean she was fired. She stopped working. It's like she just finished her sentence. Okay. Okay. All I would say is that she was, I thought that. That's who she was. Let me start over again. Okay. I can't hear you. I'm sorry. Okay. So it's just the microphone. It's all you guys have. Okay. You can sort of get that in the screen. I'm wanting you to help me if I'm getting something wrong in the record. I thought the record was that in December of 2008, she had a whole series of emergency releases, and you didn't want hospitalization. And that caused her to have to take off time from her job, right? And then finally, her employer just said, look, this isn't working. Basically, you're not able to show up enough. And so her employment was terminated, whether she was fired or whether she was just not able to return. I thought that happened in December, late December of 2008. So have I missed something there? I think she did seek treatment for anxiety in December 2008, but I don't see anything in the record that says anything about what her employers did about that. I'm taking that as the date she stopped working. So she was complaining of anxiety around that time. But that's it. Okay. Last thought. But my only thought was that we have some indication that she was suffering from severe enough, I think it was anxiety or panic attacks, that prevented her from continuing her employment. Whether she could be right, maybe she wasn't fired, fired, but she was not able to continue working. And that just seems a pretty good indication, right, that this diagnosis that she got later in May of 2010, that that wasn't the first point in time in which she, in fact, was not able to work. Well, if someone's stopping work because of what they're saying, I'd rather assume it isn't the same as Social Security, and them being unable to work. People will always say, I stopped working because I couldn't because of my medical condition. But that's not the legal conclusion that the Social Security Administration has to make. So in 2008, she stopped working. Then her day-lasting strength is literally the end of 2008. So I think that there's, and then let's look what happened in 2009. Exhibit 2 asks us all about her treatment in 2009, and it's at Golden Valley. The only diagnosis is anxiety state unspecified. And if you look at those two bit notes, none of them are consisting of any kind of extreme limitation or extreme kind of anxiety. It's when you say you need this kind of treatment. In fact, in June, she specifically said she was looking for a job, a desk job, and her treater said she had reported no symptoms of sleep changes, anxiety, focusing, depression, moodiness, suicidal thoughts, or any kind of abnormal thoughts or feelings. That's in the middle of June or the middle of 2009. So she says at the first hearing that since December 2008, she has had panic attacks constantly every day. How come her treatment records all through 2009 fail to support that? So that's 2009. Then you get to 2010, and that, I think, just absolutely takes care of any day-of-application. Her day-last insurance, as this court has held, if you apply for blood benefits after you're day-last insured,  that you were still insured. So that's the end of 2008, middle of 2009, where there's very unremarkable findings. And I would say that even when she goes to emergency rooms for these anxiety situations or palpitations, I didn't see any one of them talking about how this is debilitating. And as the LT said in the decision, you would assume that in the severity of her allegations that some doctor during that period would have said, hey, there's really something wrong with this woman. She should see a specialist. She shouldn't be working. She should be, you know, in some kind of serious treatment, given the severity of her allegations. So then in 2010, which is January 2010, is the absolute earliest back that she could be entitled to an onset based on this SSI application, because she applied at the end of December. So we're talking about four months, January, February, March, April of 2010. Let's look what happens at the beginning of 2010. Then she visits the hospital for neck pain and asthma, and they say she's positive for anxiety. But she gets worse and her symptoms result completely. Unremarkable mental status findings since January 2010. We go to March 2010. Her self-report, she says she admits going out three times a week. She gets rides to go places. She shops. She engages in hobbies. She's, um. Wait, I thought she said. I thought she said that since she stopped working back in the year 2000, she basically did not go out of the house for your. I'm sorry. I'm sorry. I'm sorry. I'm sorry. I'm sorry. I want to hear your responsibility on that. I'm sorry. So it's not yours. I just wanted to get my whole sentence out. I thought she said. And she would not go out of the house, except to go shopping occasionally with her mother. But that was about the extent of what she could do, because she was, you know, just getting treated all the time. So you're seeing this wrong. Yeah. I can see that that's absolutely not supported by the record. And, um. Okay. Why is that what she said? So is there something that shows that, in fact, all of a sudden she's now frolicking around? Well, I guess part of what I would say is everything that I just reiterated about her treatment. Nobody says anything about why she's really on a binge. She's always, you know, pretty much. Even when she's at age, she's still, you know, in acute distress. They say things like that. In March 2010, she did report that she goes out to church. She goes out three or five times a week. And she didn't need to be accompanied when she went out. She said that in March 2010. So that already absolutely contradicts anything that she said about it. Is there a difference? Because also, though, each time she had anxiety about something prescribed, that she took it, it appears that that scared her. Yes. Absolutely, yes. And she actually testified to that at the first hearing, too. So then we have Dr. Cushman in May 2010. He, in his opinion, provides the earliest possible onset date that's supported by medical evidence. And that's what the ALJ did. And why the agency talks about what happened to her after that is because there are two other state agency doctors who come subsequent to May 2010. And she actually was capable of working. So what the ALJ did by using Dr. Cushman's examination date as the onset, is actually give her a much more favorable onset date than could have. You know, in July 2010, Dr. Cichowski finally sees that the claimant's not disabled. And then subsequent to that, Dr. Garcia found that in September 2010. So that's why what happened after matters. What the ALJ did here was reasonable. He came to this absolute earliest possible time that medical evidence supports finding a disability. And he said, well, I don't agree with those state agency doctors because I see the treatment records, which finally starts with Dr. Barr with Mr. Thompson. Of course, that's in 2012. He's a social worker who was referred by Dr. Cohen. She starts reporting these very significant symptoms to him. And the ALJ looks at that. That's July, August, into December 2012. 2011. But her complaints and her symptoms are much different than they were prior to May 2010. Okay. By the way, I ask you this because maybe I'm just too simplistic in my thinking, but I see somebody with her history, and I see her on it just remembering us back to childhood. It's just there's a lot of things that happened to her leading up to the May 2010 date. And it just seems impossible that she was, you know, magically rendered disabled to have some kind of disability. So that suggests to me right off the bat that there's probably some date going back, and you just don't know when exactly. So how about the regulation says, well, when it's ambiguous? Do you need some medical help to help you conclude that date? Well, I think that's reading it too broadly. If that were the case, every time it doesn't really – it's not a magical date. It has to be reasonably based on medical evidence here. So the ALT did that. I think the ALT did that. So Cleveland's contesting it now. And, you know, Armstrong, you said that once the ALT's created a record that helps identify the onset, we should change the proof that that was a wrong date. Earlier when you were talking about what would a medical examiner do or a medical expert do here, what would it do? The record's already here. Two CNHC experts looked at it. Subsequent to Dr. Krishnan, they found it still didn't support disability. So what would a medical expert do? Sit there and look at stuff. It could be some random date that might have been different. It might also be after May 2010. So the SSR does not require an ALT to get a medical expert anytime there's some kind of condition that doesn't warrant an absolute date-specific onset. What regulation requires is the ALT to report that with a Cleveland medical basis, and we have that here. And case law doesn't interfere with that. Armstrong specifically says that once it's determined a claim, it has a burden to prove that it's wrong. And Cleveland just hasn't done that here. All of that history didn't prevent her from working all the way up to December 2008. And I would also just like to note that certain doctors did look at her up to that point, and none of them said, as the LGC said, none of them said she's disabled or she has all these disabling limitations. I think the RFC that the LGC says that she accounts for a lot of that stuff up to 2010. Let me just take another run at it. I'm a little bit slow on this development. So I look at the records in December of 2008, and all of the hospital visits she makes, it's like almost every other case, it's like she's going into the emergency room with panic and anxiety attacks. And was it certified or not? That is what led her to stop working, and she didn't work after that point. I guess I'm stuck on, well, what does that introduce new security as to whether maybe actually she was disabled all the way back then? Maybe not, but maybe. And don't we need some medical experts to evaluate all that and help us? Well, I would go back to what I said about what happened in 2009. In the middle of 2009, she's actually looking for work. And I would also ask you to really look at what those emergency room records say. She goes in, and you said it earlier, that there's nothing wrong with her. She's not hospitalized. Okay, it said nothing. So it's a physical test. But there is something wrong with her. There is no question about that. I mean, in a couple of points, I think she's hospitalized. I understand. So you're going to release her and keep her multiple nights. I only saw one where she was captured multiple nights. Yeah. And hospitalized, right? I mean, that's pretty serious. It's important. And in the whole course of her life and the things that happened to her going through it, in the one time when they did hospitalize her, I thought that was because they really were concerned about what the cardiac situation might have been. And it proves to be benign. But this woman, the fact that she kind of goes crazy and goes into an emergency room besides panic attacks, and then is pretty much contained in a relatively good period of time, doesn't say anything about what her functional abilities are, what her, and it conflicts with many other things she's done. And I really want to say, in 2009, she was looking for work. I don't know if that all I'm saying is that maybe you're right, but doesn't that raise some questions? Does that sufficiently get you to the point where there's going to be any help? I would say, no, it doesn't. In a sort of like intellectual way, it might. But based on what the ruling requires and what your case law requires, we're fine here. We have a legitimate medical basis for the onset date. And claiming sort of speculation and hope that maybe, you know, you looked at this and doesn't refute what the ALT did here. And again, I would point out, given the evidence from the state agency after May of 2010, there's a good chance a medical expert would look at this and say, she really wasn't disabled until at least August or September of 2010. So that's a big risk that I claim is taken in this case, too. I think the ALT did the right thing here. He found the earliest possible date when there was medical evidence supporting disabled symptoms. Okay. All right. Thank you very much, Gary. This has been a pleasure to meet you. Do you have some time for a bubble? Do you have a lot to respond to, perhaps? No? That's all right. Thank you. The Gordian Bubble. One fell swoop. Lori Wellington is an individual who goes to see Dr. Kushwick and describes the astoundingly of impairments that we're all aware of. And he says, how are you doing? And she says, I'm all right. And Dr. Kushwick records her response and says she giggles nervously. This is not a woman who's trying to feign disability or feign anxiety. She's trying to get through life. When you're down and out, when you're just fine, when you have nothing left, you're starting to work. It's running. If I could just get back to work, my life would be a lot better. And when we look at her earnings record, she has one year in the last 15 where she was engaged in what we call substantial gainful activity. The year that she stops working, she makes $1,200. She's not killing it. Her primary insurance on her bed is only $325 a month. She has never been a successful member of society in terms of her earnings. She's been scraping by, and now she's hit rock bottom. And she hit it when she went into the hospital in October, November, December, January, February, and March of 2009. And I think that that's Lucy Dragon, I'm not sure. Okay. All right. I don't want to take any more of your questions. Thank you very much. If you just argue, we'll be assuming it.
judges: Gould, Watford, Sands